UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NORTH SHORE CO-OWNERS'<br>ASSOCIATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-03632-SEB-TAB |
| | ) | |
| NATIONWIDE MUTUAL INSURANCE<br>COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR
## PARTIAL SUMMARY JUDGMENT

To sue an insurance company for bad faith in Indiana, an insured must prove that the

insurer had knowledge that there was no legitimate basis for denying liability. Here, a

condominium complex's roofs were purportedly damaged by hail, and the complex and

its insurer could not agree on the repair estimate. The insured, North Shore Co-Owners'

Association, Inc. ("North Shore"), bought suit against the insurer, Nationwide Mutual

Insurance Co. ("Nationwide"), for breach of contract and bad faith; a declaratory

judgment request was later added that mirrors the same issues as in their breach of

contract claim. The insurer moved for partial summary judgment on the bad faith and

declaratory judgment counts. Because Nationwide has shown a legitimate basis for

denying liability, and because the declaratory judgment count is redundant of the breach

of contract count that will likely be resolved at trial, we grant the partial motion for

summary judgment, dismissing both the bad faith and declaratory judgment claims.

## I.      SUMMARY JUDGMENT STANDARD

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). However, "[s]ummary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656−57 (2014) (quoting Fed. R. Civ. P. 56(a)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986). "Material facts" are those that "might affect the outcome of the suit," and a "genuine dispute" exists when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572−73 (7th Cir. 2021). However, the non-moving party "may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (2007). We are only required to consider the materials cited by the parties, Fed. R. Civ. P. 56(c)(3), and we are not required to "scour every inch of the record" for evidence that is potentially relevant, *Grant v. Tr. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017).

North Shore seeks to prove its claims though expert testimony, but for it to defeat a summary judgment motion, "a party may rely only on admissible evidence" and this rule "applies with equal vigor to expert testimony." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009); *see also Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 612 (7th Cir. 1993) (noting that expert testimony must be admissible to be considered in a motion for summary judgment). The Magistrate Judge has already evaluated the admissibility of North Shore's experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. U.S. 579 (1993), and concluded that only one of North Shore's experts—Martin Shields—is qualified to testify as an expert on hail damage in this case. *See* Docket No. 157, pp. 8−16. Thus, we consider only his expert evidence in ruling on this summary judgment motion, omitting any inadmissible evidence from our recitation of the facts and evidence.

## II.      FACTUAL BACKGROUND

North Shore is a condominium complex consisting of nine residential buildings located in Indianapolis, Indiana. Nationwide insured North Shore under a property loss policy that was in effect from December 8, 2016, to December 8, 2017. Docket No. 142-1, at 6.[1] The policy covers "direct physical loss or damage" to the covered property unless the loss is subject to a policy exclusion. *Id.* at 30. Relevant here, the policy excludes "[w]ear and tear," "[r]ust or other corrosion, decay, testing, maintenance, modification or

---

[1] Citation pin cites refer to the parties' ECF Filing PDF pagination numbers, not the page numbers associated with the internal documents.

repair deterioration," and "[m]echanical breakdown." *Id.* at 49, 53. In the event of a covered loss or damage, Nationwide can choose one of the following options: (1) pay the value of lost or damaged property, (2) pay the cost of repairing or replacing the lost or damaged property, (3) take all or any part of the property at an agreed or appraised value; or (4) repair, rebuild or replace the property with other property of like kind and quality. *Id.* at 57.

On or about May 19, 2017, a hailstorm reportedly damaged the roof shingles and soft metals at North Shore's condominiums, which were insured by Nationwide at that time.[2] Docket No. 122-3, at 113; Docket No. 163-12, at 3. Five days thereafter, on May 24, 2017, Plaintiff retained Matthew Latham of Crossroads Claim Consulting, a public adjusting firm, to assess the condition of its 10-year-old roofs. Docket No. 122-3, at 117. On June 6, 2017, North Shore's claim was received by Nationwide. Docket No. 163-1, at 24. On June 15, 2017, Michael Wildason, a Nationwide claims adjuster, conducted an inspection of North Shore's buildings, *id.*, with the assistance of its retained professional roof inspection company, Ladder Now, in inspecting and evaluating the cause and scope of the claimed property damage. Docket No. 163-5, at 3. Nationwide's agents discovered hail damage to the soft metals on the building but no damage to the asphalt shingles. *Id.* at 3, 149, 179, 202, 229. However, Wildason did note that one building had "potential"

---

[2] North Shore has argued that there is a dispute of fact over which party provided the May 19, 2017, date of loss to whom. It is not necessary to resolve this dispute because who provided the date of loss is not relevant in the case before us, and "[f]actual disputes that are irrelevant or unnecessary will not be counted" against an "otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247−48.

hail damage on six shingles and included this potential hail damage in Nationwide's property damage estimate. Docket No. 163-1, at 30; Docket No. 163-6, at 9. Nationwide agreed to pay for isolated repairs to these six shingles. Docket No. 163-6, at 9.

On July 11, 2017, Nationwide completed its first estimate and sent an itemized estimate to North Shore for $48,612.55 in repairs for the covered damages, including repairs to the soft metal, gutters, downspouts, and the six shingles on the one building. Docket No. 163-6, at 28−29. On July 13, 2017, Nationwide processed the estimate and mailed North Shore a check for $43,612.55—reflecting the $48,612.55 in estimated repairs minus a $5,000 deductible. Docket No. 163-7, at 2. North Shore, however, disagreed with this estimate. North Shore's adjuster, Latham, provided a competing estimate of $537,536.16 to Nationwide on October 11, 2017.[3] Docket No. 122-3, at 113. On November 7, 2017, Nationwide enlisted Nederveld Inc., a forensic engineering firm, to conduct an additional inspection on the North Shore condominiums in order to determine whether any of the shingles had sustained hail damage. Docket No. 163-9, at 4.

On November 20 and 21, 2017, Joshua Trei and Drew Knostman of Nederveld inspected the buildings and found no "hail-caused blemishes on any of the roofing materials throughout the nine units." *Id.* at 10. "No evidence of a recent hail event was observed on the properties, supported by the absence of hail-generated spatter marks on the oxidized surfaces or algae-stained roof slopes on these structures." *Id.* "All blemishes

---

[3] The Magistrate Judge has limited Latham's expertise to the replacement cost of shingles and soft metals, finding him unqualified to testify as to hail damage. Docket No. 157, at 8−11. Thus, we consider this evidence as a competing estimate provided to Nationwide, without crediting Latham's opinion that all nine roofs needed to be replaced for hail damage.

observed are aged in presentation and associated with the ongoing granule loss due to age-related deterioration of the shingles." *Id.* "Isolated mechanical blemishes observed on the roof slopes are also aged in presentation and the result of installation/maintenance activity of the roofing materials." *Id.* Nederveld also reported finding evidence as follows; an "aged hail event (occurring more than one year prior to our site visit) was observed including hail-caused indentations in the gutters and metal vent caps, absent hail-generated spatter marks on the oxidized surfaces hail-caused indentations," finding these aged hail-caused blemishes "consistent with aged hail event(s) oriented out of the west/northwesterly direction and having produced hail less than 3/4" in width at this locale."[4] *Id.* at 10, 5.

On January 5, 2018, Wildason sent Latham a copy of Nederveld's report, confirming that Nationwide's estimate included the full scope of damages covered by the Nationwide Policy. Docket No. 163-10, at 2. The letter advised North Shore that if they had information about this claim that may affect Nationwide's current decision, they should forward such information to Nationwide as soon as possible. *Id.* On May 14, 2018, Professional Engineer Martin Shields of Shields Engineering Group, Inc. inspected North Shore's roofs and was assisted by Latham. Docket No. 163-12, at 3. On June 14, 2018,

---

[4] The parties have included disputed facts in their recitations of the evidence that, while relevant to the breach of contract claim, are irrelevant to the claims currently before the court on summary judgment. For example, Nederveld's report includes a discussion of a hail verification report prepared by CoreLogic, which North Shore disputes as inadmissible hearsay. Docket No. 163, at 6–7; Docket No. 164, at 5. Factual disputes irrelevant to the bad faith and declaratory judgment claims, such as the CoreLogic report, are not included in our recitation of the facts relating to the partial summary judgment motion.

Shields provided a copy of his report to North Shore, which concluded that there was a "substantial quantity of physical hail damage" on North Shore's roofs and recommended that all roofs be replaced. Docket No. 127-5, at 56. On June 18, 2018, Latham emailed Wildason to request a copy of the Nederveld report. Docket No. 163-11, at 2. On June 19, 2018, Latham mailed a copy of Shields' report to Nationwide's office in Dublin, Ohio. Docket No. 163-15, at 3. Wildason responded via email on June 20, 2018, attaching the first twelve pages of the report and advising Latham that he would send "additional emails due to size." Docket No. 163-11, at 2.

On October 28, 2018, North Shore filed suit regarding its insurance coverage dispute against Nationwide in Indiana state court, seeking recovery for its alleged roof shingles damages. Docket No. 1-2, at 3−6. On November 20, 2018, Nationwide removed this lawsuit to federal court. *Id.* Since the filing of this suit, the parties have engaged in extensive—and costly, we assume—expert discovery, which because of its highly contentious nature has required the frequent involvement of the Magistrate Judge. *See* Docket Nos. 39, 44, 52, 54, 55, 57, 58, 62, 70, 72, 80, 86, 89, 103, 106, and 132. As the Magistrate Judge has observed: "This case has been plagued by multiple discovery disputes and other disagreements that seemingly have no end."[5] Docket No. 157, at 1.

---

[5] For example, within their summary judgment briefs, the parties have disputed whether North Shore's inclusion of a Nationwide adjuster's testimony from an unrelated case should be stricken. There, North Shore's attorneys, on behalf of another client suing Nationwide, presented Nationwide adjuster Duane Collins with the hypothetical question of whether he would tell the policyholder that there was not any roof damage after finding "six hail hits on the building." Docket No. 164-1, at 3. Collins responded that he would not because it would be "dishonest" to "tell someone who had hail damage that they didn't have hail damage." *Id.* In its summary judgment briefings, North Shore represented to the court that when "considering the facts of this case, Duane Collins, a Nationwide large loss adjuster plainly testified that Wildason's actions

North Shore has three claims against Nationwide: breach of contract, bad faith, and a declaratory judgment request. *See* Docket No. 63. Nationwide moved for partial summary judgment on the bad faith and declaratory judgment claims. Docket No. 162. We will address each claim in turn, providing additional facts where necessary.

## III.      DISCUSSION AND DECISION

### A.  BAD FAITH CLAIM

"Under Indiana law, insurers are required to deal in good faith with their insureds." *Winding Ridge v. State Farm Fire & Casualty Co.*, 942 F.3d 824, 833 (7th Cir. 2019) ("*Winding Ridge II*"); *see also Monroe Guaranteed Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005). This obligation includes refraining from "(1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim." *Erie Ins. Co., v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993). But this "does not create a new cause of action every time an insurer erroneously denies a claim." *Winding Ridge II*, 942 F.3d at 520. It has "long been the rule in Indiana" that "insurance companies may, in good faith, dispute claims." *Hickman*, 622

---

were dishonest." Docket No. 164, at 17. North Shore further represented that: "Collins found Wildason's cover-up partial denial letter to be dishonest because it stated there was no shingle damage, even though Wildason knew there was shingle damage." *Id.* In including these assertions, North Shore's attorneys are dangerously close to making misrepresentations to our court. We decline to be drawn into such collateral disputes about striking Collins' statements which would likely be inadmissible at trial under Rule 403 of the Federal Rules of Evidence. Thus, we decline to consider them here on summary judgment. *See Weit v. Continental Ill. Nat. Bank and Trust Co. of Chi.*, 641 F.3d 457, 466 (7th Cir. 1981). Even if Collins' testimony were included, our analysis would not change. *See Hemsworth*, 476 F.3d at 490.

N.E.2d at 520. Thus, in order to prove bad faith, the plaintiff must establish by clear and convincing evidence that "the insurer had knowledge that there was no legitimate basis for denying liability." *Freidline v. Shelby Ins. Co*., 774 N.E.2d 37, 40 (Ind. 2002). Plaintiffs are also required to prove an insurer's "conscious wrongdoing" or "culpable mental state." *Winding Ridge II*, 942 F.3d at 833. "This is a high burden of proof." *Id.* (citing *Inman v. State Farm Mut. Auto. Ins. Co*., 981 N.E.2d 1202, 1207 (Ind. 2012)).

In the similar case, *Villas at Winding Ridge v. State Farm Fire and Casualty Co*., 942 F.3d 824 (7th Cir. 2019) ("*Winding Ridge II*"), the Seventh Circuit dealt with a bad faith claim by an Indianapolis condominium complex against its insurance company's handling of alleged hail damage to the complex's aging roofs. 942 F.3d at 834. Because of the closely analogous facts, we summarize the decision in detail below: State Farm's adjuster had inspected all thirty-three condominium buildings and observed minimal hail damage. The adjuster then "prepared a replacement cost estimate for hail damage totaling $65,713.54, which included repairs to soft metal, some air conditioning condensers, screens, and gutters and downspouts." *Id*. at 828. The estimate "did not include repairs to any roofing shingles." *Id.* Based on these findings, State Farm paid Winding Ridge for the estimated repairs, minus depreciation costs. Winding Ridge, however, disagreed with this estimate and hired Matthew Latham (the same hired by Plaintiff in the case at bar), a "public adjuster at Crossroads Claims Consulting, to provide a competing estimate." *Id.* Latham estimated a replacement cost of $1,975,264, which included "full replacement for all shingles, decking, metal vents, flashing, caps, gutters and downspouts on all 33 buildings." *Id.* Both parties then hired appraisers, and State Farm's appraiser estimated

$79,921.80 for repairs to all thirty-three buildings, without full shingle replacement on any building, while Winding Ridge's appraiser estimated $676,824.07 for repairs, which included full shingle replacement on thirteen buildings. The parties were unable to agree on an estimate, disputing primarily whether all shingles needed to be replaced on thirteen buildings.

In *Winding Ridge II*, *supra*, pursuant to the policy's appraisal provision, the parties' appraisers selected an independent umpire, who inspected the property with the two appraisers. The umpire issued the following proposed award: (1) twenty percent repair allowance for roofing shingles on 13 buildings, (2) replacement costs for soft metal damage on all thirty-three buildings, and (3) replacement costs for roofing shingles around new turtle roof vents on all thirty-three buildings. More specifically, the umpire found that "[t]he granule loss does not indicate hail damage. During the life of a shingle granules are constantly shedding from the mat as designed." *Id.* at 829. His proposed award totaled $154,391.77. Winding Ridge was still dissatisfied with that proposed award, so their appraiser asked the umpire to modify the award to cover full shingle replacement on thirteen buildings. For the first time, Winding Ridge's appraiser reported that the original shingles were discontinued, and any replacement shingles would not match the existing shingles. Winding Ridge had received notice about this development from the shingle manufacturer during the appraisal process but failed to share this information with the umpire or State Farm's appraiser before the umpire issued the proposed award. And Winding Ridge did not submit this issue as part of the disputed loss. The umpire reviewed the additional information but did not amend the award

10

because he was asked to "establish the existence of hail damage to the shingles which was in dispute," his award already allowed for approximated spot repairs based upon the very minor hail damage observed, and "matching issues are in the realm of policy coverage issues which are not a part of this appraisal process." *Id.* After the award was made binding, State Farm issued payment to Winding Ridge. However, Winding Ridge took out a $1.5 million loan to replace the shingles on all thirty-three buildings, then sued State Farm for breach of contract, bad faith, and promissory estoppel, seeking $1.5 million in damages.

The Seventh Circuit affirmed the trial court's grant of summary judgment to State Farm on the bad faith claim, finding there was "no evidence that State Farm delayed payment to Winding Ridge, deceived Winding Ridge, or exercised an unfair advantage to pressure Winding Ridge to settle the claim." *Id.* at 833. There was also no evidence that State Farm made an unfounded refusal to pay policy proceeds to Winding Ridge because insurance companies may dispute claims in good faith. Winding Ridge submitted a claim for hail damage to State Farm, and State Farm then "investigated the claim, reached a claim estimate, and issued payment to Winding Ridge." *Id.* "Winding Ridge disputed the claim estimate and demanded an appraisal under the policy terms," and "State Farm cooperated in the appraisal process by re-inspecting the property and presenting a claim estimate to the umpire and Winding Ridge's appraiser." *Id.* State Farm subsequently paid Winding Ridge what it owed under the binding award. The Seventh Circuit concluded that Winding Ridge had "not shown any evidence, let alone clear and convincing evidence, that State Farm acted in bad faith." *Id.*

There also was no evidence in *Winding Ridge II* that State Farm acted with a culpable state of mind. "The mere fact that State Farm's initial estimate was less than the award does not suggest culpability." *Id.* at 834. "At best, it may suggest that State Farm's first inspection was inadequate," but "this alone does not constitute bad faith." *Id.* (citing *Eli Lilly & Co. v. Zurich Am. Ins. Co.,* 405 F. Supp. 2d 948, 958 (S.D. Ind. 2005)). In addition to finding that an inadequate investigation alone does not constitute bad faith in *Eli Lilly & Co. v. Zurich American Insurance Co.*, we have previously explained that a "rational or principled basis for denying a claim forecloses a recovery for bad faith." 405 F. Supp. 2d at 957 (citing *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 42 (Ind. 2002)).

Here, North Shore argues Nationwide acted in bad faith because Ladder-Now and Nederveld are "simply biased preferred vendors who are paid large sums of money every year by Nationwide," a jury could find that Wildason ignored Shields' report, and that Wildason "intentionally performed an inadequate inspection for hail damage." Docket No. 164, at 1–2, 18. North Shore repeatedly asserts these issues must be sent to a jury for resolution, but "bad faith is a legal issue that the Court must resolve, not a factual issue on which [North Shore's] claim rests." *Villas at Winding Ridge v. State Farm Fire & Casualty Ins. Co.*, 2019 WL 1434220 at *13 (S.D. Ind. March 29, 2019) ("*Winding Ridge I*").

North Shore's arguments are "untethered to the elements of insurance bad faith under Indiana law." *Id.* North Shore's arguments primarily focus on facts material to the breach of contract claim, but even if Nationwide were found liable at trial for having erroneously denied coverage and breached the contract, that alone would not support a bad faith

claim. *Hickman*, 622 N.E.2d at 520. Instead, North Shore must affirmatively demonstrate by specific factual allegations that there is a genuine issue of material fact as to whether "the insurer had knowledge that there was no legitimate basis for denying liability." *Freidline*, 774 N.E.2d at 40.

North Shore has shown that the dispute between it and Nationwide is nothing more than a good faith disagreement about the terms of Nationwide's insurance coverage, and, as we have previously explained, a "good faith dispute concerning insurance coverage cannot provide the basis for a claim in tort that the insurer breached its duty to deal in good faith with its insured." *Magwerks*, 829 N.E.2d at 976. As in *Winding Ridge*, there was no evidence that Nationwide delayed payment to North Shore, deceived North Shore, or exercised an unfair advantage to pressure North Shore to settle the claim. 942 F.3d at 833. There was also no evidence that Nationwide made an unfounded refusal to pay policy proceeds to North Shore.

Nationwide is permitted to dispute claims in good faith, and the evidence before us shows that North Shore submitted a claim for hail damage to its ten-year-old roofs, that Nationwide investigated the claim, reached a claim estimate, and issued payment to North Shore. When North Shore disputed the amount of the estimate, Nationwide hired structural engineers from Nederveld to evaluate North Shore's claim that the roof shingles were damaged from hail during a storm in May of 2017. Nederveld's findings ultimately confirmed Nationwide's estimate, and in so doing it contradicted North Shore's claim, pointing to wear and tear as the main source of the damage to North Shore's roofs. Nationwide issued payment for the direct hail-generated damage and denied payment for

damage it believed was caused by wear and tear. A "rational or principled basis for denying a claim," such as this, "forecloses a recovery for bad faith." *Zurich*, 405 F. Supp. 2d at 957. For Nationwide to succeed on its motion for summary judgment, it "must show that it 'had a rational and principled basis for denying coverage.'" *Winding Ridge I*, 2019 WL 1434220 at *12 (quoting *Thompson Hardwoods, Inc. v. Transp. Ins. Co.*, 2002 WL 440222 at *7 (S.D. Ind. March 15, 2002)). We hold that it has done just that, even if that basis is ultimately found to be erroneous, and North Shore's arguments do not alter this conclusion.

We also reject North Shore's argument that Nationwide acted in bad faith because it hired Ladder-Now and Nederveld, who are "simply biased preferred vendors who are paid large sums of money every year by Nationwide." Docket No. 164, at 2. The only support North Shore provides for this statement are the tax returns of Nederveld's income over the years from Nationwide. Docket No. 164, at 16 (citing Docket No. 150-3). There is no citation to financial information for Ladder-Now, so North Shore's argument with respect to that allegedly "biased" vendor is entirely unsupported. As for Nederveld, North Shore has provided no other relevant information, such as how often Nationwide has hired Nederveld, how much of Nederveld's business is dependent on Nationwide, how many other engineering firms Nationwide contracts with, etc. Even if North Shore had provided some of this missing contextual information as to Nationwide and Nederveld's business relationship, North Shore has failed to provide any grounds for imputing bias to an otherwise normal business relationship, especially given the myriad of possible benign reasons a company may choose to do business with another company on a repeated basis.

14

Despite extensive discovery, North Shore has provided no other evidentiary support for Nederveld's alleged bias. We reject this contention.

North Shore further argues that a reasonable jury could find that Wildason ignored Shields' report in the mail, despite Wildason's testimony that he did not receive the report. Docket No. 164, at 18. Nationwide maintains that Wildason did not receive a copy of Shields' report until after the suit was filed and that Latham "either strategically or negligently sent a copy of Shields' report to an unrelated Nationwide Office in Dublin, Ohio, instead of sending the report directly to Nationwide's handling claims adjuster for review." Docket No. 163, at 11. North Shore correctly points out that the Dublin office was listed as Wildason's contact address on some of his email correspondence with Latham, while a Grove City, Ohio address was listed on Wildason's earlier correspondence. Docket No. 163-10, at 2; Docket No. 163-6, at 2. Thus, Dublin is not an "unrelated" office. The evidence consists merely of a shipping receipt from for two-day shipping of a package sent to Dublin, Ohio. Docket No. 163-15, at 3. The receipt reveals a "North Shore" handwritten notation, and provides a tracking number, but there is no information as to the address of its destination in Dublin, Ohio, nor any certification that the package was actually received by Wildason, or suggestion that he had to sign for the package. *Id.*

Nationwide argues: "Latham mailed the document despite the fact he was in direct contact with Claim Specialist Wildason over e-mail," and "Latham never followed-up with Nationwide to confirm receipt of the report or to discuss its contents." Docket No. 163, at 11. In response, North Shore notes that "Latham testified he called Wildason

15

several times after providing the Shields report," but that "Wildason never returned his calls." And as "for why Latham did not email it, Shields' report is almost 70 megabytes," so "it was plainly too large to email." Docket No. 164, at 8.

Latham's testimony was far less specific or clear than North Shore suggests. Latham testified that he remembered trying to call Wildason after tendering the Shields report and "getting zero response," but he did not recall when he called him or when he tendered the report to Wildason. Docket No. 127-1, at 57. Latham provided no testimony about how many times he tried calling Wildason, and there was no corroborating phone data to support this testimony. Latham also couldn't recall why he did not email the report to Wildason but guessed that the report was "probably too big to email." *Id.* What the evidence does establish is Latham having emailed Wildason to ask about the Nederveld report the day before shipping Shields' report, without making any mention of his plans to send Shields' report. When Wildason sent a return email to Latham the day after Latham shipped Shield's report, Latham similarly made no reference to having shipped the report. We are left with Wildason's testimony that he did not receive the report before this lawsuit, and Latham's testimony that he mailed it to the Dublin office. These statements do not necessarily contradict each other.

However, we need not resolve this issue, because even if Wildason ignored or overlooked the report, such a mistake does not amount to bad faith under Indiana law. Indeed, "poor judgment and negligence do not amount to bad faith; rather, the additional element of conscious wrongdoing (dishonest purpose, moral obliquity, furtive design or ill will) must be present." *Masonic Temple Ass'n of Crawfordsville v. Indiana Farmers*

16

*Mut. Ins. Co.*, 779 N.E.2d 21, 29 (Ind. Ct. App. 2002). North Shore faces a high burden in proving an insurer's "conscious wrongdoing" or "culpable mental state," and even when viewing the reasonable inferences about this series of miscommunications in North Shore's favor, the evidence comes nowhere near close to meeting its obligation. *Winding Ridge II*, 942 F.3d at 833 (citing *Inman*, 981 N.E.2d at 1207). North Shore's single relevant argument regarding Nationwide's culpability is that "Wildason concluded Nationwide's investigation with an affirmative, conscious, wrongful act of deceiving the insured by stating in the denial letter that there was absolutely no hail-damaged shingles." Docket No. 164, at 16. Wildason's denial letter affirmed his initial assessment—which included the potential hail damage to the six shingles and provided for isolated repairs of them. His testimony affirming the potential hail damage to the shingles is not contradicted by the denial letter's reiteration of the Nederveld report's overall conclusion that the roofs were not damaged by hail. When read in context, we cannot say that Wildason contradicted himself, let alone acted with conscious intentional wrongdoing.

North Shore lastly argues that Wildason "intentionally performed an inadequate inspection for hail damage;" most of North Shore's evidentiary support for this argument comes from their own roof contractor Justin Reddick, whose testimony the court has already ruled inadmissible. Docket No. 164, at 15; Docket No. 157, at 11. North Shore's other support for this assertion is that the "roofs cost more than $500,000 to replace," yet "Wildason only had $25,000 in payment authority!" Docket No. 164, at 16. North Shore maintains that a "reasonable jury could find that Wildason/Nationwide had no intention of paying this claim." *Id.*

The evidence shows that Wildason had to secure approval from a manager for claims of more than $25,000, which he did in providing an estimate and payment to Nationwide for an amount over $40,000. Docket No. 163-1, at 24. Whether the roofs were damaged by hail, whether they needed to be replaced or repaired, and how much this would all cost are questions for the jury on the breach of contract claim. Even if the jury concludes there was damage in excess of Nationwide's initial estimate, the mere fact that Nationwide's "initial estimate was less than the award [would] not suggest culpability." *Winding Ridge II*, 942 F.3d at 834. "At best, it may suggest that State Farm's first inspection was inadequate," but an inadequate inspection "alone does not constitute bad faith." *Id.* (citing *Zurich,* 405 F. Supp. 2d at 958).

We reject North Shore's arguments on this issue as well. Nationwide has shown it had a rational, principled basis for denying coverage, and North Shore had not shown a genuine dispute of material facts as to whether Nationwide "had knowledge that there was no legitimate basis for denying liability." *Freidline*, 774 N.E.2d at 40. Accordingly, the court grants summary judgment in Nationwide's favor as to the bad faith claim, which is now dismissed.

## B.  DECLARATORY JUDGMENT CLAIM

The Declaratory Judgment Act provides, in pertinent part, that a court "*may* declare the rights and other legal relations of any interested parties seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added). "It is well settled that the federal courts have discretion to decline to hear a declaratory judgment action, even though it is within their

18

jurisdiction." *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 747 (7th Cir. 1987) (collecting cases). In determining whether to grant a declaratory judgment, the court should consider matters of practicality and wise judicial administration. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995). For example, the court should consider "whether a declaratory judgment action will settle the particular controversy and clarify the legal relations in issue." *NUCOR v. Aceros & Maquilas de Occidente*, 28 F.3d 572, 579 (7th Cir. 1994) (quoting *Sears, Roebuck & Co. v. Am. Mut. Liab. Ins. Co.*, 372 F.2d 435, 438 (7th Cir. 1967)). And the court should also consider whether the declaratory judgment action would serve a useful purpose. *Id.*

North Shore's Declaratory Judgment request includes the following:

- During the policy period, North Shore's covered property sustained hail damage, a covered loss, to all nine buildings.
- Loss or damage to the buildings caused by hail is covered under the Policy.
- The hail damaged shingles on all of the buildings.
- The hail damaged soft metals on all of the buildings.
- Because of the hail damage, the Policy provides coverage to replace all of the roofs on all of the buildings as itemized in Exhibit 5.
- Because of the hail damage, the Policy provides coverage to replace the soft metals on all of the buildings as itemized in Exhibit 5.
- The scope of the covered loss or damage caused by the hailstorm that should be covered under the Policy is itemized in Exhibit 5.
- The replacement cost of the hail damage that should be covered under the Policy is $537,536.16. (Exhibit 5).
- However, Nationwide denies the scope of the claimed damage.
- Nationwide also denies that the replacement cost for the loss or damage caused by the hail damage is $537,536.16.
- A present and existing controversy exists between Plaintiff and Defendant as to the scope of the covered loss or damage that should be covered under the Policy, and the amount that Nationwide should pay under the Policy for replacement cost benefits.

Docket No. 65, at 7−8. As referenced in the Declaratory Judgment count, Exhibit 5 is Latham's estimate. *See* Docket No. 65-5. These issues must be submitted to and resolved by a jury on the breach of contract claim. "Where, as here, the substantive suit would resolve the issues raised by the declaratory judgment action, the declaratory judgment action serves no useful purpose because the controversy has ripened and the uncertainty and anticipation of litigation are alleviated." *Intercon Solutions, Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1065 (N.D. Ill. 2013) (internal citations and quotations omitted). We have previously ruled that "declaratory relief [would] be inappropriate when a 'plaintiff may be fully compensated if it prevails on the breach of contract claim.'" *4310, LLC v. GES MegaOne, LLC*, 2017 WL 1197293 at *5 (S.D. Ind. March 31, 2017) (Barker, J.) (quoting *The Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 777 F. Supp. 713 (S.D. Ind. 1992)). Here, "[d]etermination of the breach of contract claim will sufficiently and effectively resolve the issues presented in this matter." *Id.* (quoting *Stop-N-Go*, 777 F. Supp. at 718).

We also reject North Shore's argument that declaratory judgment is necessary to preserve arguments about whether North Shore must actually replace the roofs before being awarded the full replacement cost benefits. As North Shore itself points out, a jury may award the full replacement cost benefits under the breach of contract count. Docket No. 164, at 25. North Shore's citation to *Rockford Mutual Insurance Co. v. Pirtle*, in which the Indiana Court of Appeals dealt with this actual replacement issue, is inapt because that case involved only a breach of contract claim. *Id.* (citing 911 N.E.2d 60 (Ind. Ct. App. 2009)). Further, the jury in that case awarded plaintiff full replacement cost

benefits, without the building having been actually repaired or replaced. *Rockford*, 911 N.E.2d at 64. A jury will be able to resolve the issues underlying North Shore's declaratory judgment count when it decides the breach of contract claim. Thus, we grant summary judgment to Nationwide on this claim and dismiss it as well.

## IV.    CONCLUSION

Nationwide's Motion for Partial Summary Judgment [Docket No. 162] is **GRANTED** as to the bad faith and declaratory judgment claims, and Counts II and III of North Shore's Amended Complaint [Docket No. 65] are therefore **DISMISSED**.

IT IS SO ORDERED.

Date:    _8/30/2022_                    _Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

William David Beyers
BUCHANAN & BRUGGENSCHMIDT PC
bbeyers@bbinlaw.com

Joseph P. Carlasare
SMITHAMUNDSEN LLC
jcarlasare@salawus.com

David E. Miller
SAEED & LITTLE LLP
david@sllawfirm.com

Sulema Medrano Novak
Faegre Drinker Biddle & Reath LLP
sulema.novak@faegredrinker.com